Filed 8/31/23  P. v. Carrillo CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY VIDAL CARRILLO,<br><br>    Defendant and Appellant. | F082996<br><br>(Super. Ct. No. CRF56188)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Anthony Vidal Carrillo (appellant) molested two young girls in separate incidents. A jury convicted him of two counts of committing a lewd act upon a child under the age of 14 years. (Pen. Code, § 288, subd. (a).)[1] The trial court sentenced him to eight years in state prison.

On appeal, appellant claims the trial court erroneously excluded the details of a prior report of sexual abuse by one of the victims, erred in admitting certain expert testimony, committed instructional error, and abused its discretion in denying his request to continue sentencing. We find no error. We affirm.

## BACKGROUND

### I. Procedural History

The Tuolumne County District Attorney's Office filed a Second Amended Information alleging appellant committed offenses involving two different victims: Jane Doe 1, and Jane Doe 2.

As to Jane Doe 1, the People charged appellant with continuous sexual abuse of a child under the age of 14 years (§ 288.5, subd. (a); count I); two counts of sexual penetration of a child under 14 years of age and more than 10 years younger than the perpetrator (§ 289, subd. (j); counts II and IV); and committing a lewd act upon a child under the age of 14 years (§ 288, subd. (a); count III). Counts II, III, and IV were alleged in the alternative to count I.

As to Jane Doe 2, the People charged appellant with committing a lewd act upon a child under the age of 14 years (§ 288, subd. (a); count V) and sexual penetration of a child under 14 years of age and more than 10 years younger than the perpetrator (§ 289, subd. (j); count VI).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The jury found appellant guilty on counts III and V, not guilty on counts I and VI, and deadlocked on counts II and IV.

## II.     Trial Testimony of Jane Doe 1

Jane Doe 1's parents were close family friends with appellant and his wife. They were members of the same church and socialized regularly. As a child, Jane Doe 1 referred to appellant and his wife as "Uncle" and "Aunt." Appellant regularly babysat Jane Doe 1 and her two brothers. Jane Doe 1's mother estimated appellant babysat Jane Doe 1 at his home about 30 times.

At the time of trial, Jane Doe 1 was 19 years old. She testified appellant began sexually abusing her when she was six or seven years old. The molestation occurred every time he babysat her. She could not recall exactly when the abuse ended, but knows it stopped before her family moved when she was in fifth grade.

Jane Doe 1 recalled three specific instances of sexual abuse. The first instance occurred when appellant was living in a cabin. He was babysitting Jane Doe 1 and her brothers. That day, they walked with appellant to a nearby store to buy candy. When they returned home, they began to watch television. Appellant was sitting in a chair and pulled her up onto his lap and put a blanket over her lap. Appellant then pulled up her skirt and rubbed her vagina, first over her underwear, then underneath. She could not recall if appellant penetrated her with his fingers.

The second incident occurred after appellant moved to a condo. Jane Doe 1 testified she believed she was in first or second grade but was not certain. As with the first incident, she was sitting on appellant's lap covered by a blanket and watching television with her brothers. Appellant put his fingers inside of her vagina. She told appellant it hurt, and that she did not want him to do it anymore. Appellant told her he would give her $10 if he could "go in further," and she agreed. Appellant continued, but it still hurt, so she told him to stop, which he did.

3.

The third incident also occurred in the condo. Jane Doe 1 could not remember how old she was, but believed it happened sometime after the second incident. She testified she went upstairs with appellant to the master bedroom. Appellant asked her to help him go to the bathroom. He walked to the toilet, pulled down his pants, and put her hand on his penis. Afterward, they both sat down on the bed. Appellant's pants were still down, and he asked her to rub him. She was nervous, but she trusted appellant, and he told her that her pastors, parents, his wife, and God all said it was okay. He gave her some lotion, and she put her hand on his penis and rubbed it.

Jane Doe 1 testified she did not disclose the molestation until she was older because she was confused and did not want her parents to see her differently. She also did not understand appellant's conduct was wrong. She loved appellant and he continued to do nice things for her, like buy her treats. She still saw him as her uncle.

In 2017, when Jane Doe 1 was 16 years old, a male friend requested they engage in sexual acts. This gave her anxiety and caused flashbacks. While speaking to her close female friend about the male friend's request, she disclosed appellant's abuse for the first time.

The next day, while Jane Doe 1 was at church, her pastor called her into her office, and told her that her friend had reported that she may have been molested. Jane Doe 1 began crying and told the pastor about appellant's abuse. The pastor spoke with Jane Doe 1's parents, who contacted law enforcement the following day. Jane Doe 1 was interviewed at her house by a sheriff's deputy. Several months later, she gave a forensic interview at the Tuolumne County District Attorney's Office. She also met several times with the prosecutors assigned to appellant's case.

Jane Doe 1 testified she grew up around Jane Doe 2, who is a couple of years older than she. They knew each other through church, and their parents were friends. She never spoke with Jane Doe 2 about appellant's sexual abuse. She did not learn of Jane

4.

Doe 2's allegations against appellant until she was told by one of the assigned prosecutors.

On cross-examination, the defense admitted the recording of a pretext phone call Jane Doe 1 made to appellant with the assistance of law enforcement. During the call, Jane Doe 1 repeatedly accused appellant of sexually abusing her. Appellant denied the abuse, but apologized if he "ever did anything that made [her] uncomfortable."

### III.    Trial Testimony of Jane Doe 2

Appellant was a close friend of Jane Doe 2's parents when she was young. Appellant would regularly come over to her house for "LAN parties," where appellant, Jane Doe 2's father, and others would play video games.

Jane Doe 2 was 22 years old at the time of trial. She testified that during one of the LAN parties, when she was around six years old, Jane Doe 2's parents sent appellant into her room to fix her computer. She was sitting on her bed and was getting ready to go to sleep. When appellant entered, she started rushing at him to tickle him, and he would grab her and tickle her, then let her go. Jane Doe 2 testified each time appellant grabbed her, he would move his hand further under her clothing. She testified that the last time he grabbed her, he put his hand under her underwear, and penetrated her vagina with his fingers. Appellant suddenly dropped her when her mother came into the room. Jane Doe 2 ran across the hall to the bathroom to urinate and felt a burning sensation.

Jane Doe 2 did not disclose appellant's act of sexual abuse until she was older because she was confused, did not understand what appellant had done was wrong, and was worried she would not be believed.

When Jane Doe 2 was 15 years old, she went on a boating trip with her family, appellant, and appellant's wife. During the trip, she felt like appellant's "eyes were on [her] a lot," and she overheard appellant or his wife say they thought she was a lesbian because she had never had a boyfriend. She testified this caused memories of appellant's abuse to resurface.

The following year, Jane Doe 2 began having an "emotional breakdown." She decided to tell her parents that appellant had sexually abused her. However, she asked them not to call the police because she did not want to deal with the stress or subject her family to it.

In 2017, when Jane Doe 2 was 19 years old, she joined the military and moved across the country. The following year, her father sent her a news article stating appellant had been arrested for sexual assault. She believed the unnamed victim in the article was Jane Doe 1 based on an incident that occurred when she was six or seven years old. Appellant was babysitting her and Jane Doe 1 at his cabin. She was sitting on the couch watching television next to appellant, who had Jane Doe 1 on his lap underneath a blanket. She saw appellant's hand moving underneath the blanket near Jane Doe 1's crotch area. Appellant's conduct made her uncomfortable, so she got up and left the room. She never spoke to Jane Doe 1 about what she observed or told Jane Doe 1 about what appellant had done to her.

After reading the news article, Jane Doe 2 decided to disclose appellant's sexual abuse to law enforcement. She reported the incident to the authorities at her military base and was interviewed by the Naval Criminal Investigative Service. She was subsequently interviewed over the phone by members of the Tuolumne County Sherriff's Office and District Attorney's Office.

IV.    Expert Witnesses

A.    People's expert

Blake Carmichael, a clinical psychologist called by the People at trial, was qualified as an expert in the area of child sexual abuse, including disclosure, memory, and the effects of abuse on children. He testified that there are many misconceptions about the behavior of victims of child sexual abuse. One misconception is that children immediately report abuse. Most children delay reporting at least one year, and often delay until adulthood.

6.

Another misconception is that sexual abuse is usually perpetrated by strangers. Rather, most abuse is perpetrated by a person close to the victim. The closer the relationship to the accuser, the longer the victim generally delays disclosure.

A third misconception is that child sexual abuse victims display a sad or angry demeanor. Child victims often appear stoic or unaffected when discussing their abuse.

Carmichael testified that disclosure of sexual abuse is often a slow process, and it is common for the child victim to initially give a brief description, then share more details over time. Child victims tend to recall more specific details the closer in time the disclosure is to the abuse. Recalling specific details of abuse that occurred long ago will be more difficult, even if the abuse occurred multiple times.

Carmichael explained that "grooming" is the process by which a perpetrator gains repeated access to a child victim then incorporates sexual contact into the relationship. He testified that he has reviewed research regarding false allegations in the context of child sexual abuse, and that "[t]ypically what's reported is in the context of child custody issues and child contact."

### B.     Defense expert

Alex Yufik, a forensic psychologist called by the defense at trial, was qualified as an expert in the field of memory. He testified that memories can easily be altered because they are not stored like a video recording or photograph. Rather, memory is a "reconstructive process," meaning that when a person recalls an event, their memory is reconstructed from fragments of previous memories, and is affected by their present mental and emotional state.

Yufik explained that "memory corruption" is "the process by which an original memory becomes contaminated." Memories can be corrupted by exposure to post-incident information or the passage of time. The corrupted memory will feel accurate because the individual can no longer differentiate between the genuine memory and the

7.

corrupted information. A false memory can also be created by repeated exposure to post-incident information.

## V. Defense Case

### A. Trial testimony of appellant

Appellant denied sexually abusing Jane Doe 1 or Jane Doe 2. He testified he only babysat Jane Doe 1 and her siblings one time when his wife was not present. He never babysat her when her brothers were not there. Jane Doe 1 often sat on his lap, but he only recalled her sitting on his lap one time while at the condo.

Appellant recalled going into Jane Doe 2's room once during a LAN party to set up a computer for her father. While in the room he played with Jane Doe 2, picked her up, and tickled her. He never touched her near her vagina.

### B. Trial testimony of appellant's wife

Appellant's wife testified she used to be very close friends with Jane Doe 1's mother. Between 2007 and 2010, when they were living in the cabin, she and appellant used to babysit Jane Doe 1 and her siblings about twice per month. They babysat less frequently once they moved to the condo in 2010. They never babysat for Jane Doe 1 and Jane Doe 2 at the same time. She only recalled one instance when appellant babysat Jane Doe 1 while she was not present. She never saw appellant do anything inappropriate with Jane Doe 1. While it was common for Jane Doe 1 to sit on appellant's lap, she never saw appellant put a blanket over them.

### C. Conditional examination

The defense introduced the conditional examination of a sheriff's deputy who was unavailable to testify at trial. The deputy interviewed Jane Doe 2 over the phone shortly after she reported appellant's abuse to law enforcement. During the interview, Jane Doe 2 stated appellant touched her vagina when she was nine years old while appellant was in her room fixing a computer. She stated appellant did not penetrate her vagina.

## DISCUSSION

**I.** **The Trial Court did not Abuse its Discretion in Excluding the Details of Jane Doe 1's Prior Sexual Abuse Allegation Against a School Bus Driver. Any Presumed Error was Harmless.**

In 2007, when Jane Doe 1 was seven years old, she alleged that she was sexually abused by a school bus driver. The People moved to exclude the allegation, and the issue was extensively litigated. The trial court allowed the defense to elicit the fact of the allegation and the circumstances of disclosure but excluded the underlying details of the alleged abuse under Evidence Code section 352.

Appellant contends this ruling was an abuse of discretion because the evidence was central to the defense theory that Jane Doe 1's memory had become corrupted, and that she conflated the abuse by the bus driver with her allegations against appellant. We disagree. We conclude that the trial court acted within the scope of its broad discretion to exclude evidence under Evidence Code section 352, and that any presumed error was harmless.

### A. In ruling on the admissibility of the bus driver allegation, the trial court fashioned a remedy in accordance with Evidence Code section 352 that addressed the competing interests of the parties.

The People filed a motion in limine to exclude a 2007 allegation by Jane Doe 1 that a school bus driver sexually abused her. She made the allegation when she was seven years old and in second grade. The sexual conduct began when she was in kindergarten. According to the People, the bus driver was terminated from the school district, but the allegations were deemed "unsubstantiated" by law enforcement and no charges were filed. Defense counsel represented it obtained a copy of a police report of the investigation, which stated Jane Doe 1 reported the bus driver had her sit on his lap, touched her vagina, and asked her to touch his penis.

The People argued the prior allegation should be excluded under Evidence Code section 352 because it would necessitate additional evidence to determine whether the

9.

allegations were true or false, resulting in a " 'trial within a trial.' " Defense counsel responded that the allegation was relevant regardless of its truth, and that the defense was "willing to live with the answer provided by the witnesses." Defense counsel argued that if Jane Doe 1 testified the allegation was false, it would be relevant to her credibility because it showed she was willing to lie about being sexually abused; if she testified the allegation was true, it showed she was able to promptly report sexual abuse, negating the People's need for an expert to explain delayed reporting; and if she was unable to recall the allegation, it was relevant to show her memory of events occurring during that time was faulty.

The issue was repeatedly litigated by the parties, both before and during trial. The trial court adjusted its ruling several times as additional evidence was presented. Ultimately, the court ruled the defense was allowed to introduce evidence of when, how, and where Jane Doe 1 first disclosed the bus driver incident; that she was interviewed by law enforcement; that the accused was a bus driver; and that she alleged "inappropriate touching." However, the underlying facts of the allegation were excluded.

At trial, defense counsel presented Yufik with a hypothetical mirroring Jane Doe 1's allegations of sexual abuse. Specifically, defense counsel asked him to consider a seven year old who promptly reports an incident of sexual abuse, then 10 years later alleges a different person abused her around the same time as the first allegation of abuse. Yufik opined that the victim could have conflated details from the two incidents, combining them into an amalgamated version of what occurred.

Following Yufik's testimony, the defense renewed its request to introduce the details of the bus driver allegation, arguing that the details were highly relevant in light of Yufik's testimony that Jane Doe 1 may have conflated two different events. The trial court rejected this request, stating it had "fashioned a remedy to allow" the jury to learn of the fact of the bus driver allegation and the circumstances under which it was made.

Explaining its reasoning for excluding the underlying details of the bus driver allegation, the court stated:

> "[U]nder [Evidence Code section] 352, the consumption of time here, and the risk of confusing the jury as to what the issue is in this case— because the issue in this case is not whether there was an allegation in 2007 or whether—or whether it was true or not.
>
> "You still have the testimony of [] Dr. Yufik. You still have the fact that—you can still argue to the jury that something happened in 2007 and she's confusing it."

On cross-examination, Jane Doe 1 agreed she made an accusation against the bus driver that was "similar" to her accusations against appellant. She clarified that the two accusations were "completely separate" in her memory.

During closing argument, defense counsel argued to the jury: "It doesn't matter to the Defense's case whether … that accusation was true or false. If it's true, then we have memory corruption, right? Because now here's an accusation that you don't know the specifics of. If it's false, you have a girl who made false accusations."

Appellant now argues the trial court abused its discretion because the details of the bus driver incident were highly relevant, and their exclusion undermined the core defense argument that Jane Doe 1's memory was unreliable.

## B.     Standard of review

Evidence Code section 352 allows a trial court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal absent a clear abuse of discretion. (*People v. Karis* (1988) 46 Cal.3d 612, 637.)

"The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the

11.

mechanical application of automatic rules. [Citations.] We will not overturn or disturb a trial court's exercise of its discretion under [Evidence Code] section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

## C. Exclusion of the details of the bus driver allegation was not an abuse of discretion.

The record demonstrates the trial court worked extensively with the parties to fashion an evidentiary ruling that balanced their competing interests. But the most significant factor in the trial court's analysis was its concern that admission of the details of the bus driver allegation would necessitate the undue consumption of time and might confuse the jurors and distract them from the ultimate issue of appellant's guilt. In explaining its ruling, the trial court reasoned that while some aspects of the bus driver allegation would be admissible, "[w]e are not going to try … the bus driver, case. We are here on [appellant's] case, and we're going to try [appellant's] case."

The trial court's concerns regarding undue consumption of time and juror confusion were reasonable. Appellant's trial involved two victims who independently reported that appellant sexually abused them. Their testimony included descriptions of numerous incidents of sexual abuse spanning years. The trial court was justifiably concerned that the addition of an uncharged, unsubstantiated allegation against a third party would have required additional witnesses, testimony, and evidence, further complicating an already lengthy and complex trial.

However, the trial court recognized that the fact of the allegation was relevant to the defense's case.[2] For this reason, it allowed the jury to hear when, where, and how the allegation was disclosed, and that it involved some form of sexual contact. While the

---

**2** We need not address respondent's contention that the bus driver allegation would have been relevant *only* if it was shown that the allegation was false. Appellant contends the prior allegation is relevant because it impacted her memory, not because it reflects on her capacity for truthfulness.

specific nature of the contact was not revealed, the jury learned that Jane Doe 1's allegation against the bus driver was "similar" to her allegations against appellant.

Given the latitude the defense was given to explore the bus driver allegation during trial, we are unpersuaded that the trial court's ruling unfairly limited its memory corruption defense. Defense counsel was allowed to ask Yufik a hypothetical question mirroring Jane Doe 1's allegations, and Yufik explained that her memory may have become corrupted or conflated due to the bus driver incident. Based on this hypothetical and the evidence admitted a trial, defense counsel was able to argue during closing that the bus driver allegation resulted in memory corruption.

Appellant also argues that a juror question asking if they would learn the details of the bus driver allegation shows that said details were highly probative. After Yufik testified, a juror submitted the following question: "Will we get the details about the abuse of [Jane Doe 1] w/the bus driver so we can compare that to see if her memory was corrupt? i.e. see if they are similar."**3** Appellant provides no authority that a juror question is relevant to a trial court's Evidence Code section 352 analysis. In any event, the question highlights the trial court's concern that admission of the details of the bus driver allegation would distract the jury from the ultimate question of guilt, causing them to focus unnecessarily on the details of an uncharged, unsubstantiated allegation.

Evidence Code section 352 vests a trial court with broad discretion, particularly on the admission of collateral matters pertaining to witness credibility. (*People v. Price* (1991) 1 Cal.4th 324, 412 [a "trial court has discretion to exclude impeachment evidence … if it is collateral, cumulative, confusing, or misleading"]; *People v. Mills* (2010) 48 Cal.4th 158, 195 [a trial court has "broad power to control the presentation of proposed impeachment evidence"].) Here, the trial court was faced with a complicated, nuanced evidentiary issue. After extensive litigation and numerous hearings, the trial court

---

**3** The trial court allowed jurors to submit written questions for witnesses. (See Cal. Rules of Court, rule 2.1033.)

concluded excluding the details of the bus driver allegation was warranted to avoid the undue consumption of time and confusing or misleading the jury. On this record, we cannot conclude that this ruling was "arbitrary, capricious and patently absurd." (*People v. Jennings*, *supra*, 81 Cal.App.4th at p. 1314.) Accordingly, our review for an abuse of discretion reveals the trial court did not err, and this claim lacks merit.

## D. Harmless error

Even assuming the trial court erred, any presumed error was harmless. Appellant contends the error is subject to the more stringent "beyond a reasonable doubt" standard for federal constitutional error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). He argues the exclusion of the underlying details of the bus driver allegation violated his Sixth and Fourteenth Amendment rights to present a complete defense and to a fair trial. We disagree. As our high court has explained, "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*People v. Hall* (1986) 41 Cal.3d 826, 834; see also *People v. Jennings* (1991) 53 Cal.3d 334, 372.) Where, as here, the alleged error involves the misapplication of "Evidence Code section 352 to exclude defense evidence … the applicable standard of prejudice is that for state law error." (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Accordingly, we apply the standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Under *Watson*, reversal is not required unless it is reasonably probable the appellant would have obtained a more favorable result had the error not occurred. (*Ibid.*)

In assessing prejudice under *Watson*, "an appellate court may consider 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " *(People v.*

14.

*Rogers* (2006) 39 Cal.4th 826, 870.) Here, the evidence establishing appellant's guilt was strong and compelling. Two victims testified appellant sexually abused them in separate, unrelated incidents. Their testimony at trial was clear, coherent, and logical. Jane Doe 1, who had no motive to fabricate her allegations, reported appellant's abuse to law enforcement without any knowledge that appellant had abused Jane Doe 2. Jane Doe 2, who also had no motive to lie, reported appellant's abuse to her parents before she discovered appellant had abused Jane Doe 1. The independent nature of each allegation serves as corroboration for the other. Moreover, as appellant notes, his primary defense at trial was that the victims' memories had become corrupted and were unreliable. The jury's verdict shows they rejected this defense.

Appellant suggests the jury's not guilty verdicts in counts I and VI and deadlock on counts II and IV shows it found the prosecution's case "less than overwhelming." He characterizes the trial as a "credibility contest," and noted that the victims provided inconsistent statements about certain details. We reject this characterization. The verdict demonstrates the jury may have harbored some doubt as to the nature and extent of the charged sexual abuse, but it concluded beyond a reasonable doubt that appellant sexually abused both victims. While there was no physical evidence corroborating the victims' testimony, they each independently accused appellant of sexual abuse. Moreover, Jane Doe 2 testified that she saw appellant touch Jane Doe 1's crotch area while sitting on the couch, corroborating her allegations of abuse. Finally, while we recognize there were inconsistencies in the numerous statements given by each victim, these inconsistencies were thoroughly litigated at trial. The jury nonetheless found the victims credible, and that finding was supported by the record. Conversely, the verdict demonstrates the jury rejected appellant's testimony that he did not abuse the victims.

Considering the strength of the evidence of guilt, and that appellant was still able to meaningfully raise his defense of memory corruption, we conclude it was not

reasonably probable that admission of the underlying details of the bus driver allegation would have impacted the verdict, and any presumed error was harmless.

## II.    The People's Expert did not Relate Inadmissible Statistical Evidence or Profile Evidence.  Any Presumed Error was Harmless.

Appellant contends Carmichael related improper statistical evidence about delayed reporting, the demeanor of sexual abuse victims, and false allegations, and that such testimony prevented the jury from correctly weighing the evidence of guilt.  He also argues Carmichael provided inadmissible profile evidence by describing grooming behavior in a manner consistent with appellant's conduct.  We conclude Carmichael's testimony was proper, and any presumed error was harmless.

### A.    Standard of review

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion."  (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

### B.    Statistical evidence

#### 1.    *Background*

Addressing misconceptions regarding delayed reporting, Carmichael testified that research shows 50 to 75 percent of child sexual abuse victims do not report within the first year of being abused.  He concluded that "it's just not true that most kids tell right away or quickly.  Some do, but most do not."  He testified the research shows some child victims never do disclose, although the number is difficult to quantify.  Other research shows "upwards of 60 to 70 percent of kids don't tell until after they turn 18."  He explained this might be due to the victim having more independence, or distance from the abuser.

16.

Later, addressing the misconception that child sexual abuse victims will appear sad or angry, Carmichael explained one study shows 70 to 75 percent of kids who talk about their abuse "may appear stoic and unaffected."

When asked about false allegations of child sexual abuse, Carmichael testified that he has reviewed research in the area. He explained that reviewing such research is necessary because it is "important to understand that people do lie." When asked if there are "certain dynamics" present in the research, he explained, "Typically what's reported is in the context of child custody issues and child contact. And that research is—shares that adults are making a greater number of those allegations as opposed to the child. But that's a general overview of that body of research."

### 2. *We decline to find forfeiture.*

As a threshold matter, respondent contends appellant forfeited the instant claim by failing to object. We disagree. At the outset of Carmichael's testimony, defense counsel objected to Carmichael relating "percentages of children who don't disclose or percentages of accusations that are false." We conclude this was sufficient to preserve the issue for appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 434.)

### 3. *The People's expert did not relate improper statistical evidence or opine the victims' testimony was truthful.*

It is well established in California that expert testimony is admissible to identify and explain common behaviors and reactions of sexually abused children, such as delayed disclosure. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*); *People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*); *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*).) This is often referred to as expert testimony on child sexual abuse accommodation syndrome (CSAAS). (See, e.g., *Lapenias*, *supra*, 67 Cal.App.5th at p. 166; *Sedano*, *supra*, 88 Cal.App.5th at pp. 477–478.) The purpose of this testimony is to assist the jury by "dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged

17.

child victim of sexual abuse.' " (*Sedano*, *supra*, 88 Cal.App.5th at p. 479.) Such expert testimony is admissible because it helps "to explain the emotional antecedents of abused children's seemingly self-impeaching behavior," and to "rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301.)

However, expert testimony on child sexual abuse "is inadmissible to prove that the complaining witness has in fact been sexually abused." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) "An expert witness may not give an opinion as to whether another witness is telling the truth, or whether the defendant is guilty." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 176.) Ultimately, the expert testimony must not cross the " ' "fine but essential" line between an "opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning [the] defendant's legal guilt." ' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 887 (*Julian*).)

This line may be crossed where an expert witness is permitted to testify, "either qualitatively, or with specific statistics or percentages—to the infrequency with which children make false allegations of sexual abuse." (*Sedano*, *supra*, 88 Cal.App.5th at p. 480.) For example, in *Julian*, the court held it was improper for the People's expert to opine that false allegations of child sexual abuse " 'happen very infrequently or rarely,' " and that studies show a " 'one to six percent' false allegation rate." (*Julian*, *supra*, 34 Cal.App.5th at pp. 883–884, italics omitted.) The court explained that such evidence "invited jurors to presume [the appellant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case.' " (*Id.* at p. 886.) Similarly, in *Lapenias*, the court held it was error to admit expert testimony that it is " 'rare' " for children to make false allegations of sexual abuse. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179.) It reasoned that such testimony "violated the general rule that an expert may not

18.

give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*Ibid.*)

Appellant contends that, as in *Julian* and *Lapenias*, the trial court erred in allowing Carmichael to relate statistical evidence regarding victims of child sexual abuse. We disagree. As we explained in *Sedano*, "Statistical probabilities are not inherently suspect when it comes to explaining CSAAS. Though appropriately broached with caution … statistics remain admissible if they merely educate the jury to counter 'a specific "myth" or "misconception" suggested by the evidence.' " (*Sedano*, *supra*, 88 Cal.App.5th at p. 482, fn. omitted.) Carmichael related statistics from various studies regarding delayed reporting of sexual abuse and the demeanor of child sexual abuse victims when discussing the abuse. This provided empirical support for his expert opinion regarding common myths and misconceptions about child sexual abuse. In other words, he used statistics to explain the basis for his opinions. This "served the permissible purpose of helping the jury evaluate [the victim's] credibility, free of preconceived misconceptions, while not relieving jurors of their ultimate duty to independently determine the truthfulness of her testimony." (*Sedano*, *supra*, 88 Cal.App.5th at p. 483.)

We are similarly unpersuaded that Carmichael's discussion of studies involving false allegations was improper. Carmichael informed the jury he was aware of research on false allegations, that it is important to understand as an expert in this area that false allegations do happen, and that false allegations are most prevalent in the context of child custody disputes. At worst, this testimony was irrelevant to this case, which did not involve a child custody dispute. But more significantly, Carmichael did not testify to the frequency of false allegations generally, or opine that false allegations are rare.

To conclude, we reject appellant's assertion that Carmichael's use of statistics was improper. His testimony stayed within the permissible bounds of expert testimony by assisting the jury in evaluating the credibility of alleged child sexual assault victims without conveying or implying that their claims are credible. Accordingly, the trial court

19.

did not abuse its discretion in admitting the challenged portions of Carmichael's expert testimony.

### C. Profile evidence

#### 1. *Background*

The prosecutor asked Carmichael to describe grooming in the context of child sexual abuse. Carmichael testified that the "grooming process" is the manner in which a perpetrator integrates sexual contact into the relationship with a child and maintains "continued sexual access." Grooming can occur in many ways. Sometimes the perpetrator and the victim have a preexisting relationship, and sexual contact is introduced through the slow escalation of physical touch. Often the perpetrator makes overtures to the victim to keep the sexual abuse secret, warning that they may get in trouble if they tell others. The perpetrator may also offer gifts or treats in exchange for continued access or silence.

#### 2. *The claim is forfeited.*

Respondent contends appellant's claims regarding profile evidence were forfeited for failure to object at trial. As to this claim, we agree. At trial, defense counsel initially objected to Carmichael's testimony regarding grooming, alleging it was outside of the scope of his proffered expertise. He also argued, without specifying a basis, that testimony about grooming was "too prejudicial" to go before the jury. However, he requested the trial court allow him to voir dire Carmichael on the issue outside of the presence of the jury, which the court granted. Following voir dire, defense counsel stated, "I'm going to withdraw my objection."

An appellant's " ' "failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida*, *supra*, 37 Cal.4th at pp. 433–434.) Here, defense counsel did not object below on the ground that Carmichael's testimony constituted inadmissible profile evidence. In any event, he ultimately withdrew his objections to the testimony. Accordingly, this claim is forfeited.

### 3. The People's expert did not relate profile evidence.

Appellant contends Carmichael's description of grooming impermissibly suggested he was guilty because he fit a certain profile. We reject this contention.

"A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*People v. Prince* (2007) 40 Cal.4th 1179, 1226.) Profile evidence is not per se inadmissible but is "objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt." (*People v. Smith* (2005) 35 Cal.4th 334, 358; *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084–1085 (*Robbie*).)

For example, in *Robbie*, which appellant relies upon, a defendant charged with sexual assault maintained he had consensual sex with the victim. (*Robbie*, *supra*, 92 Cal.App.4th at pp. 1079–1080.) A prosecution expert on sexual offenders opined that many rapists employ minimal force, acting under a " 'cognitive distortion' " that the encounter is consensual. (*Id.* at p. 1082.) In response to a hypothetical question mirroring the defendant's conduct, the expert opined it was consistent with " 'the most prevalent type of behavior pattern that I have seen with sex offenders.' " (*Id.* at pp. 1082–1083.) However, the expert acknowledged the behavior was "equally consistent with consensual activity." (*Id.* at p. 1083.) The appellate court concluded the expert's opinion constituted improper profile evidence because it invited the jury to conclude the defendant was a sex offender if he engaged in conduct "consistent with both innocent and illegal behavior." (*Id.* at p. 1085.)

We conclude *Robbie* is inapplicable here. Carmichael did not "profile" appellant. Specifically, he did not evaluate appellant's conduct against a pattern or profile or opine that appellant fit said pattern or profile. He did not refer to appellant at all, nor evaluate any hypotheticals mirroring appellant or his alleged conduct. Carmichael merely

21.

provided the jurors with general information about the types of behaviors that often precede sexual abuse and the common responses of victims to that behavior. Moreover, unlike objectionable profile evidence, this description of grooming, the process by which a perpetrator gains access to children for purposes of sexual abuse, is not behavior that is as consistent with innocence as guilt.

Appellant claims that during closing argument the prosecutor urged the jurors to apply Carmichael's testimony about grooming as profile evidence. This is not supported by the record. The prosecutor discussed grooming in the context of explaining why the victims, children molested by a close adult friend, felt conflicted about appellant's conduct and delayed reporting. The prosecutor did not suggest the jury convict appellant because he or his conduct fit a certain profile. Accordingly, this claim lacks merit.

### D.     Harmless error

Even assuming Carmichael's testimony was improper, any presumed error was harmless. We apply the *Watson* standard of review to the erroneous admission of expert testimony. (*People v. Prieto* (2003) 30 Cal.4th 226, 247; see *Lapenias*, *supra*, 67 Cal.App.5th at p. 170; *Robbie*, *supra*, 92 Cal.App.4th at p. 1088.) For the reasons discussed below, we see no basis to conclude the expert testimony at issue rendered appellant's trial "fundamentally unfair," and therefore the *Chapman* standard for federal constitutional error is inapplicable. (*People v. Partida*, *supra*, 37 Cal.4th at p. 439.)

Carmichael's discussion of the areas challenged by appellant—statistics, false reporting, and grooming—was only a small part of his testimony. "The jury was by no means 'bombarded' " with it. (*Sedano*, *supra*, 88 Cal.App.5th at p. 484; see *Julian*, *supra*, 34 Cal.App.5th at p. 888 ["Such evidence may not be prejudicial where it occurs in a slight passing reference by the expert. But here the jury was bombarded with it."].) Moreover, the prosecutor did not return to this evidence during closing and argue appellant was guilty based on statistical probabilities or because he fit a profile. He merely reminded the jurors in general terms of the patterns of behavior explained by

22.

Carmichael and asked them not to discredit the victims because their behavior fit these patterns. Given these considerations and the strong and compelling evidence of guilt, we conclude there is no reasonable likelihood the challenged expert testimony impacted the verdict, and any presumed error was harmless.

**III.    The Consciousness of Guilt Instruction was Supported by Substantial Evidence.  Any Presumed Error was Harmless.**

The trial court instructed the jury with CALCRIM No. 362 (Consciousness of Guilt:  False Statements), based on appellant's statement during a pretext call with Jane Doe 1 that she asked to watch him urinate.  Appellant contends this was error, claiming he did not suspect he was under criminal investigation, and that the statement did not relate to the charged crimes.  We conclude the instruction was supported by substantial evidence, and that any presumed error was harmless.

**A.    Background**

During Jane Doe 1's testimony, the defense admitted a recording of a pretext call she made to appellant.  At one point in the call, appellant stated, "I remember you asked one time, if you could watch me go to the bathroom, but [my wife] was there."  Jane Doe 1 testified this statement was not true.

At the jury instructions conference, the court noted that the People had requested CALCRIM No. 362.  The court stated it would give the instruction based on appellant's statement during the pretext call that Jane Doe 1 asked to watch him urinate.  Defense counsel argued the instruction should not be given because appellant did not make the statement for self-protection, and it was not related to a charged crime.  The court responded appellant made the statement "when he was accused of having committed the crime; so I think it is connected to the crime."

The court instructed the jury with CALCRIM No. 362 as follows:

> "If [appellant] made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending

23.

to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.

"If you conclude that [appellant] made the statement, it is up to you to decide its meaning and importance.  However, evidence that [appellant] made such a statement cannot prove guilt by itself."

## B.    Standard of review

A trial court is obligated to instruct a jury on the general principles of law that are raised by the evidence.  (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.)  Substantial evidence must exist for a trial court to provide a particular jury instruction.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)  In this context, "[a] trial court properly gives consciousness of guilt instructions where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions."  (*People v. Bowman* (2011) 202 Cal.App.4th 353, 366.)

We review a claim of instructional error de novo.  (*People v. Cole*, *supra*, 33 Cal.4th at p. 1210.)

## C.    Instructional error did not occur.

Appellant initially asserts the evidence did not establish his statement that Jane Doe 1 asked to watch him urinate was false.  However, the falsity of the statement need not be "conclusively established" before the consciousness of guilt instruction may be given.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102.)  Rather, "there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference."  (*Ibid.*)  This may be shown by any prosecution evidence, including "the testimony of trustworthy witnesses."  (*People v. Kimble* (1988) 44 Cal.3d 480, 498.)  Here, Jane Doe 1 testified appellant's statement was false.  For purposes of substantial evidence, her testimony was sufficient to support giving the instruction.

Appellant suggests the consciousness of guilt instruction is only warranted where the speaker was aware that he or she was under investigation by law enforcement.  We

24.

disagree that the instruction only applies in such limited circumstances. "The inference of guilt comes from the fact that a falsehood was told in order to mislead the authorities and avoid suspicion, not the time at which the statement was made." (*People v. White* (1995) 35 Cal.App.4th 758, 772; see *In re M.S.* (2019) 32 Cal.App.5th 1177, 1186 [inconsistent statements by juvenile to hospital personnel regarding death of her newborn properly considered by juvenile court in determining guilt].) Here, appellant made the statement at issue during a pretext call while being accused by Jane Doe 1 of sexual abuse. He repeatedly told Jane Doe 1 that her accusations could "ruin [his] life," and stated the consequences could be "criminal." A jury could conclude that he was aware a criminal investigation might be forthcoming, and that Jane Doe 1 was likely to report anything he said to law enforcement. Under these circumstances, a jury could reasonably infer he made false statements to Jane Doe 1 to either try to stop her from reporting the abuse to law enforcement, or to mislead authorities by providing an innocent explanation for her accusations.

Finally, appellant argues the allegedly false statement was not related to the charged crimes. However, the statement still involved conduct of a sexual nature, and was related to her allegation that appellant had her hold his penis while he urinated. Again, a jury could reasonably conclude the statement was part of his overall effort to deflect blame for his actions, and suggest the victim remembered the incident incorrectly. Accordingly, we conclude the consciousness of guilt instruction was supported by substantial evidence, and the trial court did not err in giving it.

### D. Harmless error

Even assuming the trial court erred in giving CALCRIM No. 362, we would not find the error prejudicial. The parties agree, as do we, that the alleged instructional error is subject to the *Watson* standard of review. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130.)

25.

CALCRIM No. 362 does not direct the jury to draw an adverse inference against the defendant. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 666.) It merely instructs the jury that if it finds the defendant made a false or misleading statement, it is up to them "to decide its meaning and importance." (CALCRIM No. 362.) Thus, if CALCRIM No. 362 was not supported by substantial evidence, it was at worst irrelevant or inapplicable, and the prejudicial effect was minimal. (See *People v. Cross* (2008) 45 Cal.4th 58, 67 ["[G]iving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' "].)

Considering the nature of the alleged error in light of the strong and compelling evidence of guilt, there is no basis to conclude the trial court giving CALCRIM No. 362 had any outcome on the verdict. Therefore, we conclude any presumed error was harmless.

## IV. The Trial Court did not Abuse its Discretion in Denying Appellant's Motion to Continue the Sentencing.

At sentencing, appellant moved for a continuance to investigate newly discovered evidence in the probation report. In her victim impact statement, Jane Doe 1 stated she had been receiving eye movement desensitization and reprocessing (EMDR) therapy. Appellant contends the trial court abused its discretion in denying his motion to continue sentencing to give him the opportunity to determine whether such therapy may have impacted her memory. We conclude the trial court did not abuse its discretion.

### A. Background

Jane Doe 1 submitted a victim impact statement at sentencing, which was attached to the probation report. In the statement, she described the years of counseling she has received to address appellant's conduct. This description included the following statement, "I need to continue my EMDR therapy to help me heal from the more traumatic memories that still haunt me."

26.

Appellant filed a motion to continue sentencing based on Jane Doe 1's reference to EMDR therapy. In the motion, defense counsel stated he first learned that Jane Doe 1 had been receiving EMDR therapy when he received the probation report five days before sentencing, and that he could not have known about it earlier because Jane Doe 1 and her family were not cooperative with the defense. He claimed he did "cursory research of EMDR therapy" and located a research article stating, "Taken as a whole, this small body of work suggest[s] that eye movements do not reliably affect susceptibility to misinformation, nor do they appear to enhance memory, but they do seem to increase spontaneous false memories." The article is by Dr. Elizabeth Loftus, whose research was referenced by both experts during trial. Defense counsel did not identify the title of the article or submit a copy to the court. He claimed he had reached out to Yufik and to another expert about EMDR therapy but had not received a response. He also stated he had done "other internet searches for EMDR and they are all similar regarding the danger of creating false memories." He requested a continuance to research EMDR therapy and locate an expert who can provide evidence to make the necessary showing for a motion for a new trial pursuant to section 1181, subdivision (8).

At the sentencing hearing, appellant's counsel argued he needed time to consult with an expert because "obviously false memories was the keystone of the defense in this case." The prosecutor stated he had briefly spoken with Jane Doe 1 and her mother, and that he believes "there hasn't been much, if any, of this EMDR therapy engaged."

The trial court denied the motion to continue, stating:

> "EMDR is—the Court is at least somewhat familiar—well, it stands for Eye Movement Desensitization and Reprocessing Therapy. We could engage in all kinds of speculation about what effect it could or couldn't have on memory.

> "This trial was—as [defense counsel] points out, the defense all involved memory. But I have no—I mean, to grant a continuance here would be to speculate that there might be something there. And I don't think that that rises to the level that justifies continuing the sentencing for

27.

which all parties were given a significant amount of time to prepare and have prepared quite exhaustively.

"And the Court is going to find that this is not good cause to continue the sentencing, and the motion to continue will be denied."

## B. Standard of review

A motion for a new trial based on newly discovered evidence is governed by section 1181, subdivision (8), which states:

"When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable."

A continuance in a criminal matter "shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) In the context of seeking additional time to develop a motion for a new trial based on newly discovered evidence, the moving party "must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time." (*People v. Beeler* (1995) 9 Cal.4th 953, 1003.)

"The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked." (*People v. Beames* (2007) 40 Cal.4th 907, 920.) "A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process. [Citation.] Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)

## C. Denial of the motion to continue sentencing was not error.

We conclude the trial court's denial of appellant's motion to continue was not an abuse of discretion. The defense provided the court with a quotation from a single article

about EMDR therapy and false memories.  On its face, this article indicates the science in this area has been subjected to limited research, and its conclusions are not well established.  The article's apparent conclusion, that a "small body of work" suggests this type of therapy "seem[s] to increase spontaneous false memories," was vague and equivocal.  Defense counsel claimed he located other materials supporting the conclusion that EMDR therapy causes false memories, but he did not provide the court with this material.  While we recognize the defense had only a few days to prepare the continuance motion, its showing that EMDR therapy was potentially significant to the outcome of the trial was marginal and speculative.

At trial, the defense extensively challenged the accuracy and validity of the victims' memories through cross-examination, impeachment, and the testimony of expert witnesses.  The jury ultimately rejected that challenge and found appellant guilty of sexually abusing both victims.  Against this backdrop, the trial court's conclusion that it was mere speculation that EMDR therapy would have affected the outcome of the trial was reasonable.  The jurors had already concluded that despite appellant's challenges, the victims' memories were reliable.  Given the vague and limited showing that EMDR therapy may have impacted Jane Doe 1's memory, appellant failed to establish any likelihood that this additional avenue of attack would "render a different outcome probable."  (*People v. Farmer* (1989) 47 Cal.3d 888, 917, abrogated on another ground by *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

Having observed the entire trial, the trial court was in the best position to assess the potential materiality of EMDR therapy, and the record supports the trial court's ruling.  Accordingly, we conclude the denial of the motion to continue was not an abuse of discretion.

## V. Appellant's Cumulative Error Claim Lacks Merit.

Appellant raises a claim of cumulative error. He contends that, based on the totality of some of the errors identified above, he suffered a fundamentally unfair trial. We disagree.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid*.)

We reject Appellant's claim of cumulative error because we have denied all of his individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].) Taking all of appellant's claims into account, we are satisfied that he received a fair adjudication regarding his guilt for the sexual abuse of Jane Doe 1 and Jane Doe 2.

## DISPOSITION

The judgment is affirmed.


LEVY, Acting P. J.

WE CONCUR:


MEEHAN, J.


DE SANTOS, J.

30.